Good morning, your honors. Ben Coleman for Appellant Rami Ghanem. As the court is aware, this case involves a sentence that was an extraordinary variance from the applicable sentencing guidelines. What I'd like to do, and this may be overly ambitious, is address the district court's failure to adequately explain the extent of the variance departure and address the 35-53-86 arguments, because I think those are related. Then we're going to hopefully talk a little bit about foreign conduct and acceptance of responsibility, and if I can get to substantive reasonableness, I will. With respect to the failure to explain the extent of the departure and the comparative cases, I think that one of the first points, and I probably, I did say this in the briefs, but should have maybe emphasized it a little bit more, is that the probation department recommended a sentence of 20 years, and we vigorously disputed that that was appropriate, but the district court went a decade over even what the probation officer recommended, with no real explanation as to why they needed to impose an additional decade. Obviously, in this case, it's more than two decades over the guideline range. The only thing the district court did, really, was say, well, the combined But that's not the analysis the court is supposed to undertake. It's supposed to determine the extent of the variance from the guideline range, not from the combined statutory, the way the sentence from the combined statutory maximum. So this court really has no way to evaluate why it felt that enormous extent of the departure of variance was appropriate. The district court, as I understood it, was relying both on some grounds for departure as well as a variance from the guidelines. Did the court, as you understand it, ever sort those out so that we know how much was attributed to departure and how many levels and what that produced, and then plug that into a variance, or how did it work out? We do not. I mean, the district court didn't say, I'm going to depart six levels or eight levels, and then I'm going to vary another decade on top of that. It didn't articulate any mathematical basis. It didn't articulate any sort of kind of comparison to the guideline range as to how it got to where it got. It just said, I'm going to impose 30 years, almost 25 years above the guideline range without any explanation as to how that compared to the actual guideline range. And I know Your Honor, Judge Clifton wrote the in-bank decision in the sum. I mean, there's sort of a similar problem there, except in the reverse. The district court just discusses some facts of the case, but does not explain how it's getting so far removed from the guideline range. In that case, the court went down rather than up. This case has an unusual context because it had been a previous sentencing where you're talking about the re-sentencing, after the most important count was tossed out on venue grounds. To what extent can we properly consider, or can the district court properly relate back to what had happened already? I don't think the court should, and I think it's a real problem. Let me just say there were two different district court judges. The court may understand that. But, I mean, the problem is that the district court, the first judge arrived at his sentence because it was Judge Otero. He'd been retired. And then Judge Anya Roca took over. But the first judge imposed his sentence based on a guideline range. The government claimed it was life in prison. The district court ultimately came down to like, you know, somewhere in the neighborhood of 30 years. And then the district court gave the guideline sentence. There was also a 25-year mandatory minimum. Is there an appeal from that element of the first judgment? Ultimately, the appeal was successful with regard to venue. Was the sentence appealed? No, I did not appeal the sentence. But that's because it was within the guideline range. I mean, what was I going to do? Come up to the court and say, Your Honor, should reverse the sentence within the guideline range? We get those appeals. I think we got one today. Yeah. Well, you know, look, I think the arguments I made were much better, obviously, along the appeal. So, you know, I've got to choose what are my best issues for the appeal. So we're in a totally different posture. So to the extent that the new judge is really emphasizing what the old judge did when the guideline range, the statutory, I mean, there's a huge mandatory minimum penalty. It's a completely different playing field on the second appeal. So, I mean, on the second sentence. So we think... Can the resentencing judge be mindful of what had happened before and the discussion that had gone on before? Because ultimately, the problem we have here is that, although there might be a good reason for it to do it, the Supreme Court so far hasn't said that you In this case, we have conduct, which the charge was dismissed on venue grounds. But if you can consider acquitted conduct, and you may well have things to say about that, but I'm not sure with regard to what factors can be considered for sentencing, why it would be inappropriate for the district court to reflect upon what had happened before. Well, I think the district court, I guess, can reflect. They can take a lot of things into consideration. I think this case presents another interesting wrinkle, because the conduct that was dismissed was foreign conduct, and whether the district court could consider that. But I think what a district court could say is, well, Judge Otero gave 30 years, but I think the big question is, I have no idea what Judge Otero would have given if he had known that the guideline range was only in the neighborhood of 67 years, and there was no 25-year mandatory minimum. And I think that's borne out, and this relates to 3553-86, because if you look at the other cases, there is nothing like this in the other cases. Well, I mean, the key distinction here is the sheer quantity of weapons your client was involved in. Not necessarily the same operation, but his visual devices showed that he sold a million rounds of anti-aircraft ammos to a militia group in Libya, anti-tank missiles, you know, literally millions of rounds of ammos. And that's, I think, I don't know if it was the first judge or the second judge, you know, called breathtaking quantities. I mean, isn't that really the distinguishing factor here? Of the other cases? I don't think so. Let me just, the millions of rounds of ammunition and everything, you have to remember, there were discussions about those types of things, but very little was ever actually materialized, any deals ever actually went through. And a million rounds of ammunition, although it sounds like a lot, is actually probably in the neighborhood of, like, a couple hundred thousand dollar deal or something like that. I mean, it's not valuable. You don't say anti-aircraft missiles, anti-tank. Look, so Victor Bout, let's take Victor Bout, the most notorious arms dealer of them all. His offenses of conviction were not only the 2332-G for surface-to-air missiles. By the way, in that case, he was negotiating a deal for 800 surface-to-air missiles. So we're talking an enormous quantity, plus he has a long history of illegal arms deals. But he also was convicted of conspiring to kill American civilians and American military in dealing with a foreign terrorist organization. He had all those convictions, none of which we have here, enormous quantities of equipment. He got less time than Mr. Donnell. And then, of course, there was a prisoner swap for him, and he served maybe a decade and is gone. I mean, even looking at the quantities that are involved, there's nothing that compares to this. But, you know, also looking at direct impact on U.S. interests, we've got cases where there's, plus you use surface-to-air missiles to bomb a military airport in the United States, as well as bomb two synagogues in New York City. Those defendants got less time than Mr. Donnell. So, you know, for all these reasons, there's no, and I made all these arguments in the district court, there's no discussion of any of those cases under 3553-A6. This court has no way of knowing why a sentence of this extraordinary magnitude and variance was appropriate. I did have a few other issues I want to discuss that seem down to a minute. I think I'll save the remaining time unless there's any questions. All right. Thank you. All right. So we'll hear now from Ms. Palmer. Good morning. Carly Palmer on behalf of the United States. May it please the Court. I'd like to start with one of defense counsel's statements, that very little was materialized. That's a position the defendant has taken throughout the long litigation. That's not what the district court here found. That's not what the evidence shows. That evidence is what supports this extraordinary departure or variance, and that evidence is also why defendants shouldn't receive acceptance of responsibility credit. I ask the same question of you that I asked of the opposing counsel, which is should we be troubled by the fact that, as a procedural matter, the district court did not separate out the issue of departure and the issue of variance, because, you know, under the pre-Booker regime, he would have been required to identify grounds of departure and then to say what number of levels were required. That would have led to a different guidelines range, and then you would consider the issue of a variance under 3553. But he didn't do any of that. We know he thought there were grounds for departure, but it just kind of got all mixed into the soup and out pops 30 years. It's a post-Booker world. It's a little soupier than it was before. I would point the court to Gaul, where the Supreme Court said, we want to look at a holistic analysis, and in a post-Booker world, the guidelines are one of many factors that need to be weighed by the district court. But when the statute says the guidelines have to be considered, is it referring to the pre-departure range, or is it referring to the departure range so that he should have cleaned that up first before plugging it into the 3553 mix? That's my question. I think the guidelines range, the starting range that needs to be considered, that needs to be the offense level, the criminal history category, the starting range. And it's very clear that the district court here anchored its decision on that. It refers to that several times. It talks about starting from there and then moving up. It talks about the departure, and then it talks about the variance. In total, it would have been a 12-level departure. The court doesn't break down, you know, how many levels are departure or how much is the variance. But in a post-Booker world, you know, the case law doesn't require that. Mix doesn't require that. You asked for a particular number of levels of departure and then vary from that. Did you break it down? No, the government asked for a 30-year sentence and a holistic analysis, but it cited to both the departure justifications for that and the variance justifications. What's troubling about that in this case may be the oddest case in the post-Booker world because under the first part of Booker, Apprendi applies to the guidelines. Under the guidelines, his sentence should have been, you know, in what, 78 to 96 months or whatever the range was. And a departure upward was strictly limited to grounds identified by the commission, and it would have to be by an analogy to the appropriate number of levels. And Booker says that he has a constitutional right, that that cap of the guidelines is treated as a statutory maximum. And he has a constitutional right to have the jury determine whether we're going to go above that. So that's the statutory scheme that Congress created, and that's the constitutional right under Apprendi that he has. But under the remedial portion of Booker, the judge can do whatever he wants. In the pre-Booker world, this sentence is plainly illegal. Under the statute as written by Congress, this sentence is plainly illegal. Absolutely, but this is a post-Booker world. Under Booker, the remedy for his Sixth Amendment right not to have the sentence go over and to have a jury determine whether it goes over, the remedy for that, do whatever you want. Doesn't that strike you as just odd? I don't. Maybe because I've come up in a post-Booker world at the U.S. Attorney's Office. But that being said, I think the Supreme Court in Gall approves of this more holistic analysis. It says the guidelines are one factor that needs to be considered. And there's a wide range of reasonableness that is much broader than the guidelines range. And that wide range of reasonableness is set by any mandatory minimum and any statutory maximum. It's somewhere within there. So here we weren't dealing with a situation like Apprendi where we're dealing with you. Some fact that's going to change the permissible range available to the sentencing judge. We're looking within the permissible range of sentences. And this was, quite frankly, an extraordinary case. You know, this was a defendant. The scale of terror that this lone defendant was able to reign in war zones was remarkable. And that's something that was commented on by both the district courts. Essentially, you know, the conviction for the lead charge with the 25-year minimum was thrown out because of the venue violation, another constitutional right. And then it just all came back in. It just kind of didn't matter. Well, it's relevant conduct. And, you know, as was discussed earlier, the Watts case says that even acquitted conduct can be considered as relevant conduct. Relevant conduct needs to be proven by preponderance. And the evidence here was actually proven beyond a reasonable doubt as found by the jury, as found by the trial court in denying the Rule 29 motion. But, again, I mean, the whole engine of why we are in the post-Booker world is that there are jury trial rights, and it matters what the jury decides. And this case shows, well, you can do whatever you want regardless of whatever the jury decides. You can set aside the jury verdict and sentence for the same conduct all over again. If it's the same conduct and it's related to the convictions that stand, then it still comes in. And so I would point the courts to the, I think it's 44 overt acts that make up the weapons trafficking conspiracy that the defendant participated in. There's a lot of overlap there between that and what ended up being put on a trial. It has to do with what are the defense services and defense products that he's providing to countries like Libya, countries like Iran, countries where the United States has said our security interests are so strong that no U.S. citizen is allowed to provide these services to these countries. So we talked about foreign conduct. But this is an American crime based on an American citizen's decision to evade these laws. There's no question that he knew he was evading the laws. We have, you know, the 19 digital devices that he travels with, those were searched. His emails were searched, and it showed this two-year conspiracy that he pled guilty to. And those same actions are laid out in the overt acts for the conspiracy that he admitted guilt to. That evidence was provided to the sentencing judge at the resentencing in the form of an 82-page sentencing position and 250 pages of exhibits. And that's the conduct that the defendant continues to deny. But that's the conduct that shows over and over and over again that this departure and this variance were warranted. If you look at the departure, it talks about the volume of the commerce. It talks about the extent of the danger to public safety. And here was someone who knew his weapons were being used in tremendous amounts in conflict zones. And they were being used, you know, the purpose of these weapons was to kill people in conflict zones. And he knew that. And that was a big part of the judge's decision was based on the callous nature of his business. The court has the recording of the defendant saying, you know, I wake up in the morning, and if there's war on television, I'm happy. War is business. I love war. There's a recording with an undercover agent where he says, I don't want the weapons that I sell to be responsible for killing Arab refugees, but those are my rules with Saudi Arabia. It's their business. So if they end up in Yemen or Syria and people die, that's not my business. But it was the defendant's business time and time again for at least the two years to which he pled guilty. And that was the finding by the district court in sentencing. Those were factual findings that are owed an extraordinary deference by this court. And the defendant's decision to continue to deny those facts despite admitting to the crimes, despite having them proven guilty of that, despite the district court finding that he trafficked in these massive amounts with this callous character, is the reason that this is a justified sentence. So that callous nature is something that was specifically looked at by the Johnson court in the First Circuit. It's relevant here. And there were specific findings by the district court that this was someone who turned a blind eye to the damage he was doing. He made the decision to, you know, essentially be a virgin to death in order to make this money. And that's why this extraordinary departure in variance was warranted for this defendant. And those same facts point to the fact the defendant here didn't accept responsibility. You know, I want to point the court to the double set of books you see in the e-mails. You see him saying, here's how much money we're going to charge for the fighter pilots that we're going to send over to Libya. And then you see a cover payment saying the exact same amount of money, we're going to put it in trucks. And if you look at the defense attorney's argument at the first sentencing, that's how he portrays the defendant. He tries to sell that same bill of goods that this is a defendant who just moves radar equipment, you know, just moves trucks. He's not dealing in these things. And that's just not what the evidence showed. It's not what the district court found. And I want to briefly talk about the Vance case because that's relied upon so heavily in the reply. There we see it's the same test being applied here but to vastly different facts. And in that case, there was no conscription. There was conscription. The defendant said he was sorry and he would never commit the crime again. Here the defendant said, I'm an American citizen, I would never harm Americans. He didn't apologize to his victims. You know, he didn't try to remedy anything. In Vance, the court specifically said there's no relevant conduct issue. Here there was a very large relevant conduct issue that drove a lot of the sentencing. There was a lack of objective, ascertainable evidence of the defendant, lack of acceptance of responsibility. Here there were piles and piles of evidence showing that this defendant did not have remorse at any point for his crimes. Anyone else there? Any more questions? No. All right. Thank you. Thank you, counsel. Should we hear a rebuttal from Mr. Coleman? I'll try to address several things. First, I don't want to say a lot on acceptance, but the government said that Vance was relied on in the reply brief. It was basically the only case that was cited in the opening brief over and over and over again. The government said nothing. They've waived these arguments. As far as, the government gets up here and they make these grandiose statements that he rained terror on all these people. And it sounds terrifying, but when you actually get to specifics, the government falls way short. The government says that he engaged in all these deals in violation of American law. If Mr. Ghanem is living in Egypt and is working for the Egyptian government to try to secure military equipment, he has not violated U.S. law. He has not violated Egyptian law. The government hasn't pointed to anything to show that any of that is in violation of law. But they want to come up here and tell you that he's engaged in all this conduct that's in violation of U.S. law. The only thing extraterritorially that he did that violated U.S. law was with respect to the reversed 2332G count. Now, the counts of conviction violate U.S. law because he was attempting to export weapons from the United States. But all these other, those arguments in attacking that particular count, that conviction, because what the court did ultimately was not rule, as I understood it, on that. It was dismissed because of improper venue. But improper venue would permit retrial in the appropriate venue. And if you'd won on the substantive argument, they couldn't have brought it back. So I'm not sure why the first appeal doesn't exclude the argument you're trying to make to us now. That wasn't my argument. I'm saying put aside the 2332G conduct, which was reversed. But they're talking about all of this other reign of terror that he inflicted on all, based on all these other deals. Your argument is extraterritoriality. And what I'm saying, it seems to me that the decision in the first appeal says, no, that's not a problem here. He could be prosecuted again within the United States. That's correct. So I'm not sure the argument you're now making basically says he couldn't properly be punished for any of that stuff, whether it's convicted or not, whether it's simply related conduct. Because if he could have been sentenced for a successful conviction, he surely could be sentenced for the same conduct that didn't result in a conviction, if you can sentence for something that didn't result in a conviction. Well, that, I mean, with respect to that particular count, because it was foreign conduct, my argument is you need to have an American conviction to sentence on foreign conduct. Now, so if they had gotten a conviction, then maybe you could look at that. But I'm talking about they got up here and they did this below. They say because he's a U.S. citizen, everything he did was illegal. They have said there's no law that says that. If you're hired by the Egyptian government to engage, to try to get military equipment, which, by the way, they've never proven. They're saying that. I continue to deny that these things were materialized. A lot of the stuff that they're talking about, they talk about a quarter-billion-dollar deal. I'll just give that example. Then they admit, oh, yeah, but before that quarter-billion-dollar deal could go forward, there had to be a much smaller 2.5-million-dollar deal. And then they never even proved that the 2.5-million-dollar deal actually took place. What I'm saying is that they are using conduct that didn't violate U.S. law, didn't violate the law of the country that he was in, and that's the basis of this extraordinary variance from the sentencing guidelines. They can't use foreign conduct at all, let alone conduct that doesn't violate U.S. law or the law of the home country. Thank you. Thank you, counsel. The case just argued will be submitted, and the court will stand in recess for 10 minutes. All rise. This court will stand in recess for 10 minutes.
judges: CLIFTON, COLLINS, LEE